**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JAN P. HALL,**

         **Plaintiff,**

**-vs-**                                                   **Case No. 6:06-cv-1737-Orl-31KRS**

**ORANGE COUNTY SCHOOL BOARD,**

         **Defendant.**

## ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment (Doc. 37) and Plaintiff's Response thereto (Doc. 47).

**I. Background**

Plaintiff, Jan P. Hall ("Hall"), was employed by the Orange County School Board ("OCSB") as a 5th grade teacher at Sadler Elementary School ("Sadler") and Ronald Blocker ("Blocker") was the Superintendent of Orange County Schools at all times relevant to this action.

Hall brings this action under 42 U.S.C. § 1983 ("§ 1983") alleging that the OCSB violated her First Amendment rights by suspending and constructively discharging her because of a letter she wrote to her Congressman. The material facts, presented in the light most favorable to the Plaintiff, are as follows:

In 2005 Hall sent a letter[1] to her United States Congressman which contained her personal opinions regarding immigration. (Doc. 47 at 1). On August 16, 2005 Anne Lynaugh ("Lynaugh"),

---

[1] A copy of the letter has been attached to this Order as Attachment 1.

the principal at Sadler, was visited by a reporter from *El Nuevo Dia*, a Spanish-language newspaper, who advised that she had received a controversial letter authored by Hall. (Lynaugh Depo. at 11-14). Lynaugh called Hall to her conference room and questioned whether she had written a letter to parents. (Lynaugh Depo. at 15-16). Hall said no; but recalled writing a letter to her congressman. (Lynaugh Depo. at 17-18). Lynaugh did not know the content of the letter, and did not discuss it with Hall. (Lynaugh Depo. at 16-17). Lynaugh kept Hall in her conference room for Hall's safety, until she was sure the reporter had left. (Lynaugh Depo. at 18). Hall requested and received a personal leave day for the following day, August 17, 2005. (Lynaugh Depo. at 18). Hall never returned to active employment. (Doc. 47 at 3).

That same day, Hall was contacted by John Hawco ("Hawco"), an investigator with Employee Relations, and agreed to meet with him on August 18th "to address issues pertaining to alleged misconduct on your part." (Lopez Depo. at Exh. 1). Hawco had been visited by the *El Nuevo Dia* reporter Lynn Guzman, who read him the content of Hall's letter, but refused to give him a copy. (Hawco Depo. at 8-9). Hawco received instructions from his supervisors to meet with Hall and suspend her without pay. (Hawco Depo. at 11-12). On August 17th, a Spanish translation of Hall's letter and a news article was published in *El Nuevo Dia*. This resulted in a strong public reaction, including threats of violence and picketing by parents in front of the school. (Lynaugh Depo. at Exh. 12). During the controversy Lynaugh received numerous voice mails and emails from community members regarding the letter, both pro and con. (Lynaugh Depo. at 29-30). Lynaugh also stated that she had to provide counselors to work with Hall's students on understanding why she wrote the letter, and had to bring in a diversity trainer for her staff. (Lynaugh Depo. at Exh. 12).

On August 17, 2005 reporting forms initiating an investigation were generated by the OCSB. (Lynaugh Depo. at Exh. 3). Although Hawco opened the file and was listed as the contact person, Blocker assigned Alfred Lopez ("Lopez") to be the lead investigator. (Hawco Depo. at 19; Lopez Depo. at 9-10). On August 18, 2005 Lopez generated a form and memorandum placing Hall on "Relief of Duty" without pay effective August 17, 2005. (Lynaugh Depo. at Exh. 4, 5). Hall was given a "predetermination notice" signed by Hawco stating the existence of "probable cause for disciplinary action, up to and including discharge"; that she was relieved of duty without pay; that the Superintendent would recommend changing that status to "suspension without pay" at the August 23rd OCSB meeting; and that she would remain in a non-pay status pending completion of the investigation, at which time Hall "shall be notified of management's decision" regarding her case. (Lynaugh Depo. at Exh. 8).

At the August 18th meeting attended by Hawco and Lopez, Hall was shown a copy of the newspaper article and questioned about it. (Lopez Depo. at 36; Hawco Depo. at 47). Hall states that Hawco attempted to have her sign a letter saying she agreed to the "terms of the agreement". (Doc. 47 at 5). When she protested and asked what the terms were, Hawco replied that they had not been written yet. (Doc. 47 at 5). Hawco stated "we can terminate you and you will lose all your benefits." (Hall Depo. at 243). Hall also asserts that Hawco said he was trying to find Hall a non-teaching or homebound teaching job. (Hall Depo. at 246-47).

On August 22, 2005 Lopez generated a memorandum directing that Hall be suspended *with* pay between August 17th and August 23rd. (Lynaugh Depo. at Exh. 9). Lopez, who had understood that Hall had been suspended *without* pay because of the community reaction to her letter, had recommended that Hall be suspended with pay because that was the usual practice

"unless there are extenuating circumstances." (Lopez Depo. at 22, 27). However, the next day, August 23, 2005, Blocker sent a memorandum to the OCSB recommending her suspension without pay, and advising that he had relieved Hall of duty without pay effective August 17th. (Lynaugh Depo. at Exh. 10). Hall asserts that notwithstanding the paper reversal of her pay status, she did not receive pay until after her resignation. (Hall Depo. at 235-39). It is undisputed that on August 23, 2005 the OCSB officially placed Hall on suspension without pay. (Doc. 47 at 5).

On August 28, 2005 Lopez issued an interim report of his investigation. (Lynaugh Depo. at Exh. 11). The report stated that a review of Hall's grade books and discipline referrals did not show any "inconsistencies" in assigning grades or imposing discipline; and that Hall's past three principals had stated that Hall's classroom performance had been "excellent" or "commendable".

Hall met with Hawco and Nancy Gray Condi ("Condi"), the union's director, on August 30th. Hall asserts that Hawco brought the same "Terms of Agreement" letter and again asked Hall to sign it. (Hall Depo. at 244). Again, Hawco told Hall that the terms were not yet written. (Hall Depo. at 245). Hawco states that he was never made aware of the terms of the "agreement", but was generally aware that discussions were in progress. (Hawco Depo. at 58-60). When Hall asked about the homebound teaching job, Hawco said "we haven't found it yet" and that the OCSB was "looking into it." (Hall Depo. at 247-48). Hawco denies being made aware of efforts to locate another job for Hall. (Hawco Depo. at 68-69). Hall states that both Hawco and Condi told her that if she did not sign the agreement the OCSB was going to fire her, and she would lose all her benefits. (Hall Depo. at 252, 258-59). Although Hawco did not directly suggest that Hall resign, Hall asserts that "the implication was strong." (Hall Depo. at 248-49). Hall went home from the meeting and faxed in her resignation notice because she decided "they weren't going to play fair."

(Hall Depo. at 250; Lynaugh Depo. at Exh. 1). That same day, Lopez issued a memorandum notifying Hall that her resignation had been accepted by the superintendent. (Lynaugh Depo. at Exh. 2).

**II. Standard of Review**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. .*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

"Courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party . . . [e]ven though the facts accepted at the summary judgment stage of the proceedings may not be the actual facts of the case." *Davis v. Williams,* 451 F.3d 759, 763 (11th Cir. 2006) (internal citations and quotations omitted). The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir. 1999).

### III. Legal Analysis

Plaintiff alleges that she was retaliated against for exercising her right to free speech, protected by the First Amendment to the United States Constitution.

> A government employer may not demote or discharge a public employee in retaliation for speech protected under the First Amendment. A government employee's speech is protected under the First Amendment if it touches on a matter of public concern.

*Mitchell v. Hillsborough County*, 468 F.3d 1276, 1283 (11th Cir. 2006) (internal citations and parentheticals omitted).

> *Pickering* [*v. Bd. of Educ*., 391 U.S. 563 (1968)] and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. *See id.*, at 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. *See Connick, supra*, at 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. *See Pickering*, 391 U.S., at 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as

employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Garcetti v. Ceballos*, 547 U.S. 410, ___, 126 S.Ct. 1951, 1958 (2006).

### A. Did Hall speak as a citizen on a matter of public concern?

Defendant argues that Plaintiff was not speaking as a private citizen because in her letter she stated that she was a teacher for 28 years at Sadler Elementary, which constitutes an "unauthorized use of her official title." However, the fact that Plaintiff identified her occupation and place of employment is not dispositive.

Plaintiff's letter is handwritten, is not on official stationary and was mailed from her home address. She signed the letter using only her name, not her official title. Furthermore, the letter did not complain about her employment with the OCSB or any of its policies. Finally, Plaintiff did not create this letter as part of her official duties. Plaintiff did discuss what she believes are the negative effects of immigration on education, and cited examples from her own experiences to support her beliefs. However, the purpose of the letter appears to be a request that the borders of the United States be closed to protect the job market as well as the education system. Therefore, this Court finds that Plaintiff was speaking as a citizen when she wrote the letter.

Next, the Court must decide whether Plaintiff's letter addressed a matter of public concern. "In determining whether an employee's speech touched on a matter of public concern, we look to the content, form, and context of a given statement, as revealed by the whole record." *Id*. at 1283. Plaintiff's letter concerns immigration laws, and Defendant makes no argument that this is not a matter of public concern. Therefore, Plaintiff has satisfied the first prong of the inquiry.

**B. Did the OCSB have an adequate justification for treating Hall differently from any other member of the general public?**

This prong of the inquiry is generally referred to as the *Pickering* balancing test. "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

> The *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public. One hundred years ago, the Court noted the government's legitimate purpose in "[promoting] efficiency and integrity in the discharge of official duties, and [in] [maintaining] proper discipline in the public service." *Ex parte Curtis*, 106 U.S., at 373. As JUSTICE POWELL explained in his separate opinion in *Arnett v. Kennedy*, 416 U.S. 134, 168 (1974): "To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency."

*Connick v. Myers*, 461 U.S. 138, 150-51 (1983).

It is clear that Plaintiff's speech in this case is entitled to a high level of protection. It is a letter directed to law makers concerning immigration, which has certainly been a widely debated political issue in this country for several years. Such communication is at the heart of first amendment protection. However, OCSB's interests are likewise very strong here. Plaintiff's letter was inflammatory and was critical of many of her colleagues and students – even if not by name. Furthermore, it is undisputed that the letter evoked a strong response from the community, including threats of violence. (Doc. 47 at 1, 4).

> In reaching its conclusion in *Pickering* the Court stated that no evidence was introduced with respect to the effect of the plaintiff's public comments on the community as a whole or on the administration of the school system by which he was employed. 391 U.S. at 567, 88 S. Ct. at 1734. The Court pointed out that the plaintiff in *Pickering* did not have close working relationships with the targets of his public criticism and there was no problem of maintaining discipline by immediate supervisors or harmony among co-workers. It was not shown, and could not be presumed, that criticism of his ultimate employer, the school board, interfered either with the plaintiff's classroom performance or the operation of the school generally. *Id.* at 569-70, 88 S. Ct. at 1735-1736. The Court commented on another problem not present in *Pickering*: public statements by an employee which are so lacking in foundation as to raise questions about fitness to perform class room duties: "In such a case, of course, the statements would merely be evidence of the teacher's general competence, or lack thereof, and not an independent basis for dismissal." *Id.* at 573 n. 5, 88 S. Ct. at 1737 n. 5. In pointing to conditions not present in the case before it (which was decided for the public employee) the *Pickering* Court gave clues to the sorts of conditions which could lead to a finding that a school board's interest does outweigh that of an employee. Conduct which adversely affects close working relationships, or makes the maintenance of discipline by an immediate supervisor or harmony among co-workers more difficult may lead to such a finding.

*Anderson v. Evans*, 660 F.2d 153, 157-58 (6th Cir. 1981).

In this case, Hall did make comments about fellow teachers with whom she had close working relationships – specifically she refers to Puerto Rican teachers who regularly ask her for help. She also made comments directed at many of the students that she was charged with teaching. And of course, there is significant evidence of the negative affect her comments had on the functioning of the school and the community as a whole. Certainly, the OCSB had reason to believe her effectiveness as a teacher had been compromised. Finally, several of Hall's statements were so lacking in foundation that they cast serious doubt on her judgment and general competence as a teacher. For example, the fact that Hall classifies Puerto Ricans as "immigrants" and "foreigners" suggests that she incorrectly believes that Puerto Rico is a foreign country. According to Hall's own estimate, 92% of the students at Sadler are Puerto Rican, and considering Hall's belief that Puerto Ricans are "trashing Orlando daily" and should be kept home in Puerto

Rico, the OCSB certainly had reason to question whether Hall was competent to continue teaching at the school.[2]

Hall argues that "while the School Board may have had legitimate concerns and interests, nevertheless it completely overreacted in an unreasonable fashion to the public political pressure created by the content of Hall's letter, tipping the balance in her favor." (Doc. 47 at 2). Specifically, she argues that the OCSB suspended her without pay, when the typical disciplinary action would have been a suspension with pay while the investigation took place. However, Hall makes no argument regarding strength of the interests that OCSB cites for suspending and constructively terminating her. With regard to this issue, Plaintiff has failed to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. Therefore, this Court finds that OCSB is entitled to summary judgment.

**IV. Conclusion**

Accordingly, it is

**ORDERED** that the Motion for Summary Judgment (Doc. 37) is **GRANTED**. Judgment shall be entered in favor of the Defendant and the Clerk is directed to close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on November 26, 2007.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

---

[2] Furthermore, considering the community in which Hall was employed, any reasonable person would know that a letter such as this one – which Hall placed in the public domain by sending it to a government official – would create controversy and negative publicity.